U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 OCT 18 PM 1: 23

CLERK

BY_____ LAW _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ANDREW S., o/b/o J.S., )
 )
 Plaintiff, )
 )
 v. ) Case No. 2:18-cv-11
 )
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
 )
 Defendant. )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND DENYING THE COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 11 & 12)

Plaintiff Andrew Santiago ("Plaintiff") brings this action on behalf of his minor child, Jasmine Santiago ("J.S."), for Supplemental Security Income ("SSI") under the Social Security Act ("SSA"). On June 6, 2018, Plaintiff moved to reverse the decision of the Social Security Commissioner (the "Commissioner") that J.S. is not disabled. (Doc. 11.) On June 21, 2018, the Commissioner moved to affirm. (Doc. 12.) Plaintiff replied on July 17, 2018, at which point the court took the pending motions under advisement.

Plaintiff argues that Administrative Law Judge ("ALJ") Thomas Merrill failed to properly evaluate J.S.'s impairment under Listings 101.02 and 101.03 and failed to properly evaluate the opinions of two of J.S.'s treating physicians. More specifically, he claims that the ALJ failed to determine if J.S. is unable to ambulate effectively when her abilities are compared to other same-age children who do not have her impairments. Plaintiff is represented by Arthur P. Anderson, Esq. The Commissioner is represented by Special Assistant United States Attorney Kristina Cohn.

**I.  Procedural Background.**

On March 19, 2015, Plaintiff protectively filed an application for SSI on behalf of his daughter, J.S., alleging a disability onset date of June 8, 2004, the date of her birth.

The claim was denied initially on August 21, 2015 and upon reconsideration on November 24, 2015. Plaintiff filed a timely written request for a hearing. On December 14, 2016, ALJ Merrill presided over Plaintiff's hearing from Manchester, New Hampshire. Plaintiff and J.S., who were represented by counsel, appeared in Burlington, Vermont and testified via video teleconference. Vocational Expert ("VE") Louis Laplante appeared in Manchester and testified. On February 22, 2017, ALJ Merrill issued a written decision finding J.S. not disabled. Thereafter, Plaintiff sought review of ALJ Merrill's decision with the Social Security Administration's Office of Disability Adjudication and Review Appeals Council, which denied his request on November 13, 2017. ALJ Merrill's determination thus stands as the Commissioner's final decision.

## II. Factual Background.

### A. Medical History.

J.S. was born on June 8, 2004 and has undergone three surgical procedures to address her bilateral congenital hip dysplasia. The first surgical procedure took place in 2005, at which time J.S. was put in a spica cast.[1] The second took place in February 2009 and the third in March 2015, when J.S. underwent right hip reconstruction.

On November 18, 2013, Lindsay Foote, P.T., saw J.S. for a physical therapy consultation which took place in J.S.'s physical education class at school. PT Foote made the following observations:

> During the warm-up, [J.S.] was able to jog with her class. She tends to run a bit slower than her classmates, and accommodates for this by running a slightly smaller loop inside the track that her classmates are running. She is able to keep running the entire time, and her endurance has noticeably improved. During stations, [J.S.] was able to participate fully without additional adult support. She worked as a team with her group and did a variety of activities without difficulty. No concerns . . . about her ability to access or participate in PE were noted today.

(AR 918.)

---

[1] A spica cast is "[a] plaster cast used for immobilization of fractures of the hip with minimal displacement in children age five or younger. . . . It generally extends from the chest to the ankle." *Hip spica cast*, J.E. Schmidt, ATTORNEY'S DICTIONARY OF MEDICINE, Lexis (database updated October 2019).

2

A Section 504 Accommodation Plan drafted on November 19, 2013 at J.S.'s school noted that J.S. had been diagnosed with bilateral hip dysplasia and recorded several accommodations to "ensure her access to her education," (AR 912) such as:

1. Limitations on the playground to include no high climbing and no hanging on outdoor equipment
2. A chair for sitting is always available, that allows her feet to touch the floor. She should not be sitting on the floor with her legs out to the side
3. Running expectations to be limited to tolerance
4. Be encouraged to express her needs for a rest or an alternative position
5. To have allowable bathroom breaks
6. Rest as an option for pain management
7. Accommodations made during PE class to allow participation and access
8. Alternative options for PE if the PE activity is deemed unsafe for her [and]
9. Physical Therapy consultation to [J.S.]'s school program 1x/month for [forty-five] minutes in a variety of school settings (classroom, playground, gym)[.]

(AR 913.)

On February 10, 2014, PT Foote observed J.S. playing tennis in physical education class, noting: "[J.S.] [could] hold the racquet properly and hit the ball over the net. She kept her balance and did not have any difficulty moving through space or getting to the ball in time. No concerns were noted today and [J.S.] did not report any pain or discomfort." (AR 917.) Following consultations on April 11 and April 28, 2014, PT Foote wrote that "accommodations are in place for [J.S.] to be able to self-limit when it comes to running and jumping." (AR 915.) She noted that J.S. sometimes needed to be reminded to limit herself with these activities when she was having fun with her friends. She further observed that while other students were running J.S. walked a shorter distance, although she stretched with the class.

J.S. continued to experience bilateral hip pain. In July 2014, she visited Scott Benjamin, M.D., who noted that J.S. reported her "right hip tend[ed] to hurt anywhere

3

from a 4 to 7/10 in intensity most of the time when she [was] up on her feet," with less intense pain when she was at rest. (AR 536.) Dr. Benjamin noted that J.S. and her family had received a referral to Dr. Young-Jo Kim at Boston Children's Hospital to discuss options for surgery. At a subsequent visit on October 30, 2014, Dr. Benjamin observed that J.S.'s ambulation and gait had improved with the use of a heel lift and a crutch in her right hand, but J.S.'s family still planned to discuss surgery with Dr. Kim.

In November 2014, J.S.'s surgeon, Young-Jo Kim, M.D., Ph.D., wrote that J.S. "is unable to effectively use her lower extremities, having difficulty ambulating without the use of crutches which may or may not be corrected with surgery, potentially as a life-long disability." (AR 553.) On March 31, 2015, he performed reconstruction surgery on J.S.'s right hip, describing the procedure as "a right hip surgical dislocation approach with a femoral valgus osteotomy with neck leg lengthening, as well as a right periosteal osteotomy." (AR 731.) On May 7, 2015, Dr. Kim reported that x-rays of J.S.'s right hip showed her osteotomies were healing well. Dr. Kim "allowed her to be full weightbearing, but still use a walker for balance." *Id.*

From April 2015 until early August 2015, J.S. received physical therapy treatment at her home from Michele Barnier, P.T. to improve her leg strength, functional mobility, and gait. On May 26, 2015, PT Barnier noted that J.S. was "[d]oing a lot more walking around her home with her walker, [but was] still using [a wheelchair] for community distances/school." (AR 1082.) On June 5, 2015, PT Barnier reported that J.S. was "making great gains with strength and mobility." (AR 768.) PT Barnier noted that J.S. was 60% weight-bearing on the right side, using her walker around her home and a wheelchair for community distances. J.S.'s prognosis was good. In July 2015, J.S. was still using a wheelchair for some mobility. She was encouraged to use a walker for all mobility within the home and for short distances in the community.

On August 6, 2015, J.S. saw Andrea Dunne, D.P.T., at Kids' RehabGYM for an initial evaluation. At this appointment, Plaintiff reported that J.S.'s walk was much slower, she was unable to keep up with her family, and was unable to get off the floor by herself. Dr. Dunne observed that J.S. could ascend stairs with reciprocal gait and one

4

handrail with poor eccentric control and descend stairs with reciprocal gait and two handrails with no eccentric control when leading with her left leg. J.S. rated her pain one out of ten and stated that her pain did not increase when she climbed stairs. Dr. Dunne opined that J.S. had a mild limitation for walking and stair climbing and she was restricted from running, jumping, or engaging in strenuous activity.

On August 19, 2015, x-rays of J.S.'s right hip showed "[s]ignificant progressive healing" and "[s]table" hardware in "excellent position." (AR 754-55.) Dr. Kim found that the x-rays demonstrated improvement from J.S.'s preoperative radiographs. He noted that J.S. was healing well, had only intermittent pain and mild limitations, was walking without a walker, and had been fully weight-bearing since her last visit on May 7, 2015.

At a September 21, 2015 appointment, Dr. Dunne observed that J.S. could perform chair squats and squat walk forward and backward for twenty-five feet. J.S. was advised to continue weekly physical therapy to improve her strength and gait. At two physical therapy sessions in October 2015, J.S. reported that she had no leg pain. Dr. Dunne found that she was tolerating the progression of activities well. At one of those visits, J.S. told Dr. Dunne that she had only done her home exercises one or two times in the previous week.

On October 14, 2015, J.S. was seen by her pediatrician, Barbara Kennedy, M.D., who reported that J.S. had been doing well since her right hip surgery and that her school performance was good. J.S. completed a "Bright Futures Adolescent Supplemental Questionnaire" in which she indicated that she participated in "physical activities[] such as walking, skateboarding, dancing, swimming, or playing basketball[] for a total of [one] hour each day[.]" (AR 841.) On November 30, 2015, Sarah Thomas, Certified Prosthetist Orthotist ("CPO"), reported that J.S. walked with improved balance and gait with her new left shoe lift.

On December 7, 2015, Plaintiff reported to Dr. Buteau (formerly Dr. Dunne) that J.S. was "doing really well since her last surgery, possibly feeling the best she ever has." (AR 947.) Plaintiff noted that J.S. "complained of pain once or twice in the past few

months, but it ha[d] not limited her participation and the complaints d[id] not last more than a few minutes." *Id.* Dr. Buteau opined that J.S. had a mild limitation for walking and no limitation for stair climbing, stating:

> [J.S.] has made great progress in PT with improvements in strength and range of motion leading to increased ease with functional mobility and gait. [J.S.] is now able to walk up the stairs without upper extremity support for the first time in her life. She is also now able to walk down the stairs with reciprocal gait and only [one] hand rail, with control while stepping down. [J.S.] displays improved gait with more equal stance time and hip clearance.

(AR 948.)

At a January 25, 2016 physical therapy appointment, J.S. reported right hip pain after her brother jumped on her hip while she was sleeping. Approximately ten days later, CPO Thomas reported that J.S. walked with improved balance and gait and her alignment was appropriate.

On March 24, 2016, a revised Section 504 Accommodation Plan was developed following a meeting at J.S.'s school. It stated that J.S.'s "ability to participate in various parts of her school day, including Physical Education, is limited due to her disability." (AR 908.) It noted that during the school day, [J.S.] needed:

-A chair for sitting at all times, that allows her feet to touch the floor. She should not be sitting on the floor.

-Running expectations to be limited to tolerance.

-Accommodations for Physical Education testing as needed.

-Accommodations made during PE class to allow participation and access.

-Alternative options for PE if the PE activity is deemed unsafe for her.

-Be allowed rest as an option for pain management.

-Restroom breaks as needed.

-Extra time, as needed, to transition from class to class.

-Physical Therapy consultation to [J.S.'s] school program monthly for [forty-five] minutes in a variety of school settings.

-On field trips that require walking/hiking, an adult will be available to walk with her.

6

(AR 909.) The Section 504 Accommodation Plan was accompanied by PT Foote's treatment notes.

On March 28, 2016, Dr. Buteau observed that J.S. had a moderate Trendelenburg gait, increased lateral sway during gait to the left, equal stance time bilaterally, and could walk laterally and backward. She could ascend the stairs with a reciprocal gait and no handrails. "[W]ith minimal verbal cuing from the PT[,]" J.S. could descend stairs with a reciprocal gait and no handrails, but with poor eccentric control. (AR 936.) Dr. Buteau stated that J.S. "made great progress in PT with improvements in strength and range of motion leading to increased ease with functional mobility and gait." *Id.*

At a physical therapy appointment in April 2016, J.S. walked on a treadmill for five minutes with cuing not to use upper extremity support. The following month, J.S. demonstrated lower extremity weakness but tolerated treatment well. In June 2016, J.S. told Dr. Buteau that she fell at a trampoline park and complained of left knee pain. Dr. Buteau advised J.S. to apply ice to her knee.

In May 2016, J.S. was seen by Dr. Benjamin, who noted that J.S. had been doing "quite well" since her surgery. (AR 825.) J.S. reported experiencing minimal hip pain and ambulated independently, although she sometimes used a cane with her right hand to try to reduce left Trendelenburg gait pattern. Dr. Benjamin noted that J.S. did not have her cane with her at the examination. He found that J.S. had good range of motion in her hip on the right side and some limitation of abduction on the left, but no pain. Dr. Benjamin advised J.S. and her family that she would need an epiphysiodesis[2] of her right leg in the near future.

On July 28, 2016, Dr. Buteau opined that J.S. should refrain from running, jumping, and strenuous activity. She observed that J.S. had a mild Trendelenburg gait and slight lateral sway during gait to the left with equal stance time bilaterally and an

---

[2] An epiphysiodesis is "[a] procedure that partially or completely damages the growth plate of a bone so as to inhibit bone growth. . . . The procedure is used to inhibit future bone growth at the site, as a means of ameliorating a leg-length discrepancy." *Epiphysiodesis*, J.E. Schmidt, ATTORNEY'S DICTIONARY OF MEDICINE, Lexis (database updated October 2019).

7

ability to walk laterally and backward. She was able to walk five minutes on a treadmill but had significant left leg length discrepancy with her left foot adducted and supinated. J.S. ascended stairs with no handrail and descended stairs with one handrail with reciprocal gait. She could also descend the stairs with no upper extremity support when verbally cued. Dr. Buteau's treatment notes listed goals, which included: (1) J.S. would have full right lower extremity strength; (2) J.S. would demonstrate fifteen sit to stands in thirty seconds without upper extremity use to indicate increased hip strength and endurance; and (3) J.S. would be able to sit in a chair for five minutes with proper posture in order to sit at the table for dinner.

Dr. Buteau found that J.S. had "no limitation" for climbing stairs and a "mild" limitation for walking. She noted that J.S.'s functional status had improved with physical therapy. She also stated that during the past four months, J.S. had difficulty obtaining rides to physical therapy and only attended four physical therapy sessions. Dr. Buteau reported that despite her less frequent attendance, J.S. continued to "make gains in normalizing gait, with [a] significant decrease in lateral sway during walking and improved independence on the stairs." (AR 929.) However, J.S. "continue[d] to be limited in hip and lower extremity strength, single leg balance, and trunk strength." *Id.* At an August 1, 2016 appointment, Plaintiff reported that J.S. was doing well and she participated in aqua therapy. In an undated letter from Kids' RehabGYM, Abby Schunk, D.P.T., opined that J.S. should limit activities that involve jumping and running.

In August 2016, Dr. Kennedy requested a Public Transportation Medical Exemption for J.S., stating that while J.S.'s "family does reside technically on the bus line, it is very difficult for [J.S.] to walk the great distance to get to and from the bus stops." (AR 829.) Dr. Kennedy noted that J.S. "copes with congenital coxa v[a]ra with

8

acetabular dysplasia"[3] and has a "5/8 leg length discrepancy[,]" which cause her to "fatigue easily and experience pain after any exertion." *Id.* She further explained:

> This disability is expected to last permanently. She does take medication to manage her pain as needed. She does not require a wheelchair, but on occasion may be using crutches or a walker, depending on her current functioning. It is best for her to walk very short distances, for example, from the medical parking lot to the lobby of the office. She would experience some difficulty walking the steps to enter the bus.
>
> Her current presentation is incompatible with the use of the bus due to the pain she experiences after exertion. Her surgeon in Boston continues to state she must refrain from running, jumping or contact sports. Her gait can be unsteady and she has a slow ambulation capacity.

*Id.*

In an October 26, 2016 Medical Source Statement, Dr. Kennedy opined that J.S. had a "marked" impairment in moving about and manipulating objects, but no limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, or caring for herself. (AR 896.) Dr. Kennedy opined that J.S.'s impairment met the requirements of Listing 101.02 for "major dysfunction of a joint(s)" and Listing 101.03 for "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint[.]" (AR 898-99.) She stated that J.S. "has congenital coxa v[a]ra with acetabular dysplasia [and] had most recent (2015) surgical intervention. She still has a significant leg length discrepancy resulting in frequent fatigue [and] some pain after exertion." (AR 897.)

Dr. Benjamin submitted a Medical Source Statement on November 14, 2016 in which he also opined that J.S.'s condition met the criteria for Listings 101.02 and 101.03. Dr. Benjamin provided diagnoses of bilateral congenital hip dysplasia, history of bilateral hip surgery, gait impairment, back pain, hip pain, and knee pain. He stated that J.S. is "limited in her walking [and] carrying tasks. This will gradually worsen as she ages. At

---

[3] Coxa vara is "[a] deformity of the hip joint caused by an abnormal sharpness of the angle between the neck of the femur (bone of the thigh) and the shaft of the femur." *Coxa vara*, J.E. Schmidt, ATTORNEY'S DICTIONARY OF MEDICINE, Lexis (database updated October 2019). Acetabular dysplasia refers to a hip joint disorder. *See id.*, *Congenital hip dysplasia*; *id.*, *acetabulum*.

9

[twelve] years old, she cannot walk throughout the day without some pain. It is more likely than not[] that when she graduates from high school this will be worse, the degree to which is unclear." (AR 905.) He found that J.S.'s gait "requires use of at least one cane and ultimately two canes to minimize forces across her hips, reduce trunk lean and protect her back. While it is not always possible for her to use canes in the practical context of her life, it would be better if she did." (AR 906.) Dr. Benjamin found that J.S. had "no limitation" in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself. (AR 904.) She had a "less than marked" limitation in health and physical well-being. (AR 903.)

On the same day, Dr. Benjamin submitted a letter to J.S.'s school, asking that J.S. be permitted to use a backpack because she had a hard time carrying books while using a cane. He stated that he had instructed J.S. to "use a cane as much as possible as it helps even out her walking and reduce pain." (AR 1090.)

## B. State Agency Consultants' Assessments.

The record contains two agency consultant assessments from Plaintiff's prior application for SSI on J.S.'s behalf. In September 2013, Donald Swartz, M.D., reviewed J.S.'s medical records and opined that J.S. had a marked limitation in moving about and manipulation of objects, noting that J.S. had "impaired ambulation, but ambulates without [an] assistive device, climbs stairs, [and] walks at school." (AR 79.) Dr. Swartz opined that J.S. had less than marked limitations in the domains of interacting and relating with others and caring for herself, observing that J.S. "[r]equires assistance with dressing legs and feet." (AR 80.) He found that J.S.'s impairments did not meet a Listing. In February 2014, Francis Cook, M.D., adopted Dr. Swartz's findings in their entirety.

In August 2015, Dr. Swartz reviewed J.S.'s medical records and found that although J.S. had a severe impairment under Listing 101.03 for "Reconstructive Surgery of Weight Bearing Joint[,]" this disability was not expected to meet the Listing twelve months after onset. (AR 98.) On November 24, 2015, Leslie Abramson, M.D., reviewed

J.S.'s medical records and found that J.S. had a severe impairment due to "Reconstructive Surgery of Weight Bearing Joint" but that J.S.'s condition did not meet, medically equal, or functionally equal a Listing. (AR 110.) Under the functional domains, Dr. Abramson found that J.S. had a marked impairment in moving about and manipulation of objects, but no limitations in the remaining domains.

### C. Plaintiff's Function Report.

On or about May 20, 2015, Plaintiff completed a Function Report for J.S. wherein he indicated that J.S. was able to walk, throw a ball, and swim, but was limited in her ability to run. With regard to caring for herself, Plaintiff checked boxes that J.S. could pick up and put away toys and help with household tasks such as cleaning dishes, making a bed, sweeping or vacuuming the floor, raking or mowing the yard, and helping with laundry. Plaintiff noted that J.S. could not tie her shoelaces or put on pants because she could not bend over. In a Function Report completed on or about October 22, 2015, Plaintiff provided the same responses.

### D. Testimony at the December 14, 2016 Hearing Before ALJ Merrill.

At the December 14, 2016 hearing before ALJ Merrill, J.S. testified that she experienced pain in her hips on a daily basis and used a cane to walk. The ALJ observed that J.S. used a cane at the hearing. When asked about whether she experienced mobility problems at school, J.S. explained that she used a backpack to carry her books when changing classes so that she could use her cane with one hand, in accordance with her doctor's note. J.S. also reported that because she could not walk quickly, she was usually late to class. In addition to difficulty walking, J.S. stated that she experienced problems bending over and sitting on the floor and that she generally did not participate in physical education class to avoid contact or impact. Beyond these mobility restrictions, J.S. testified that she experienced pain during the day and night, although it was more significant and sometimes "excruciating" at night. (AR 49.) She stated that due to her hip pain, "sometimes it's hard to . . . concentrate on my work. So I go to the nurse and get medicine." *Id.* J.S. reported that she was doing well in school, was enrolled in an advanced mathematics class, and enjoyed being a Girl Scout.

11

Plaintiff testified that J.S. cries herself to sleep and is in constant pain. He stated that J.S. needed help climbing stairs and could not bend over to tie her shoes. He noted that J.S.'s teachers and counselors are not always able to take care of her. When J.S. was with the Girl Scouts, Plaintiff sometimes received calls from the troop leader asking how to address J.S.'s pain. He reported that her hip and knee frequently popped out of their sockets. Plaintiff stated that J.S. experienced back pain and would need hip replacement surgery in the future because her condition was worsening. He testified that six or seven years prior he received a handicap placard based on J.S.'s disability.

### III. ALJ Merrill's February 22, 2017 Decision.

Under the SSA, an individual under the age of eighteen is entitled to SSI benefits when he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 1382c(a)(3)(C)(i). A three-step sequential evaluation process is used to determine whether an individual under the age of eighteen is disabled. 20 C.F.R. § 416.924(a)-(d); *see also Phelps v. Colvin*, 20 F. Supp. 3d 392, 398 (W.D.N.Y. 2014) (outlining three-step process to determine if a child is disabled).

First, the ALJ determines whether the child is engaged in any substantial gainful activity. 20 C.F.R. § 416.924(b). If the child is engaged in substantial gainful activity, he or she is not disabled. 42 U.S.C. § 1382c(a)(3)(C)(ii). If the child is not engaged in substantial gainful activity, the ALJ proceeds to Step Two. At Step Two, the ALJ determines whether the child has a medically severe impairment or combination of impairments that cause "more than minimal functional limitations[.]" 20 C.F.R. § 416.924(c). At Step Three, the ALJ determines whether the child's severe impairment(s) "meet[s], medically equal[s], or functionally equal[s]" the criteria of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d).

If a child's impairments do not meet or equal a listed impairment, the ALJ will consider how the child functions in the following six domains: "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with

others; (iv) [m]oving about and manipulating objects; (v) [c]aring for yourself; and, (vi) [h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1). A child will be considered disabled if his or her impairments "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). A "marked" limitation exists when the child's impairments "interfere[] seriously with [his or her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the child's impairments "interfere[] very seriously with [his or her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

On February 22, 2017, ALJ Merrill denied Plaintiff's application for SSI benefits, finding that J.S. was not disabled. In so ruling, he determined that J.S. had not engaged in substantial gainful activity from the date of the application, March 19, 2015, through the date of his decision. At Step Two, the ALJ found that J.S. had the following severe impairment: "bilateral hip dysplasia, status post surgeries[.]" (AR 26.) At Step Three, ALJ Merrill concluded that J.S. did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. He proceeded to analyze whether her impairment functionally equaled the Listings by determining the degree of her limitations in each of the six functional domains. He concluded that J.S. had a "marked" limitation in moving about and manipulating objects but that she had no limitations in any of the other five domains. (AR 33.) Because the ALJ found that J.S.'s impairment did not result in marked limitations in two domains of functioning or extreme limitations in one domain of functioning, he concluded that she was not disabled from March 19, 2015 through February 22, 2017.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal

13

standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "It is the function of the Secretary, not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted) (alteration in original).

### B. Whether the ALJ Failed to Properly Evaluate J.S.'s Impairment Under Listings 101.02 and 101.03.

Plaintiff argues that the ALJ failed to properly evaluate J.S.'s impairment under Listings 101.02 and 101.03 and therefore rendered a determination unsupported by substantial evidence. More specifically, he asserts that the ALJ failed to determine whether J.S. had an inability to ambulate effectively when compared to other children the same age who do not have her impairments, as required by the applicable regulations. The Commissioner responds that because the ALJ appropriately evaluated J.S.'s ability to ambulate effectively under the Listings, his determination should not be disturbed on appeal.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* (footnote omitted). An ALJ should "set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982); *see also Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012) ("Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the

14

ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings."). Nonetheless, "the absence of an express rationale does not prevent [the court] from upholding the ALJ's determination regarding [claimant's] claimed listed impairments" if the ALJ's determination is "supported by substantial evidence." *Berry*, 675 F.2d at 468.

Listing 101.02 covers the following impairments:

101.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 101.00B2b[.]

20 C.F.R. pt. 404, subpt. P, App. 1 § 101.02.

Listing 101.03 covers "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 101.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within [twelve] months of onset." *Id.* § 101.03. An "inability to ambulate effectively" is defined as follows:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 101.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

. . .

(3) How we assess inability to ambulate effectively for older children. Older children, who would be expected to be able to walk when compared to other children the same age who do not have impairments, must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out age-appropriate activities. They must have the ability to travel age-appropriately without extraordinary assistance to and

15

from school or a place of employment. Therefore, examples of ineffective ambulation for older children include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out age-appropriate school activities independently, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about the child's home or a short distance at school without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* § 101.00(B)(2)(b).

ALJ Merrill considered Listings 101.02 and 101.03 and made the following findings:

> The record contains no evidence that her hip deformity has resulted in an inability to ambulate effectively or perform fine and gross movements effectively, as defined in 101.00B2b (means an extreme loss of function of her lower extremities; i.e., an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities). The claimant testified that she is able to walk with a cane, despite pain. She carries a [backpack], attends regular classes, plays video[ ]games, uses a computer, takes care of her personal hygiene, and is able to effectively ambulate and use her upper extremities.

(AR 27.)

Plaintiff contests the ALJ's finding that "[t]he record contains no evidence that [J.S.'s] hip deformity has resulted in an inability to ambulate effectively" and points out that the ALJ failed to evaluate J.S.'s condition and abilities in accordance with the paragraph 3 requirements. In particular, the ALJ's brief discussion of whether J.S.'s condition met a Listing did not include any analysis of whether J.S. was "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out age-appropriate activities[,]" nor whether she could "travel age-appropriately without extraordinary assistance to and from school or a place of employment." 20 C.F.R. pt. 404, subpt. P, App. 1 § 101.00(B)(2)(b)(3). J.S.'s impairment affected her ability to walk as compared to her peers, as evidenced by accommodations allowing J.S. extra time to transition from class to class, a Public Transportation Medical Exemption, and permission to use a backpack to carry her books during the school day. In addition, Dr.

16

Kennedy indicated that it was best for J.S. to walk very short distances. Plaintiff further asserts that J.S.'s Section 504 Accommodation Plan supports the conclusion that she had difficulties carrying out several age-appropriate school activities independently. In addition, the regulation provides that "[t]he ability to walk independently about the child's home or a short distance at school without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

The Commissioner counters that because J.S. did not require the use of a hand-held assistive device that limited the functioning of both upper extremities for twelve months, the ALJ appropriately determined that J.S. was able to ambulate effectively under the Listings. The Commissioner further observed that J.S. was able to participate in many age-appropriate activities, such as playing tennis, walking during physical education, and stretching with her classmates; she was able to climb and descend stairs; and she was able to ambulate around her school with the use of her cane.

Although it appears that the ALJ considered the definition of "inability to ambulate effectively" in paragraph 1, he did not specifically address the additional age-appropriate criteria in paragraph 3. "The criteria in paragraph (3) cannot be ignored simply because the claimant meets the general definition in paragraph (1)." *Rosado v. Colvin*, 2016 WL 845277, at *4 (N.D. Okla. Mar. 4, 2016). Because there is medical evidence in the record which suggests that J.S. is not able to "travel age-appropriately" and engage in certain "age-appropriate activities" due to her impairment, without the ALJ's analysis of the requirements of § 101.00(B)(2)(b)(3), the court cannot "assess whether relevant evidence adequately supports the ALJ's conclusion that [J.S.'s] impairments do not meet or equal any Listed Impairment, and whether [the ALJ] applied the correct legal standards to arrive at that conclusion." *Id.* at *6 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)). Remand is therefore required in order to address this deficiency. *See id.* (remanding where the ALJ's analysis of the Listings "[did] not contain substantial evidence that [the minor claimant] failed to satisfy the *complete* definition of 'inability to ambulate effectively'") (emphasis in original); *Ingram v. Barnhart*, 2007 WL 1521040, at *4 (D.D.C. May 22, 2007) (remanding to ALJ

for failure to consider the factors listed in paragraph 3 where ALJ found claimant did not "need a hand-held assistive device to walk" because that fact was "not dispositive of whether a claimant can ambulate effectively" and the ALJ failed "to apply the complete legal standard for determining if a child has the ability to ambulate effectively").

### C. Whether the ALJ Failed to Properly Evaluate the Opinions of Treating Physicians Dr. Kennedy and Dr. Benjamin.

Plaintiff contends that the ALJ failed to provide "good reasons" for rejecting the opinions of J.S.'s treating physicians, Dr. Kennedy and Dr. Benjamin, who both found that J.S. met the requirements of Listings 101.02 and 101.03. Under the treating physician rule, the ALJ first must decide "whether the opinion is entitled to controlling weight." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). A treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). "Second, if the ALJ decides the opinion is not entitled to controlling weight, [he or she] must determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95. In so doing, the ALJ must "explicitly consider" the non-exclusive *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at 95-96 (citation omitted). "At both steps, the ALJ must give good reasons . . . for the weight [he or she] gives the treating source's medical opinion." *Id.* at 96 (internal alterations and quotation marks omitted).

"An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id.* at 96; *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned to a treating physician's

18

opinion."); *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) ("[B]ecause . . . the ALJ . . . failed to follow SSA regulations requiring a statement of valid reasons for not crediting the opinion of plaintiff's treating physician, . . . a remand is necessary in order to allow the ALJ to reweigh the evidence."). In such circumstances, the ALJ's determination may be affirmed only if "a searching review of the record assures [the reviewing court] that the substance of the treating physician rule was not traversed[.]" *Estrella*, 925 F.3d at 96 (internal quotation marks and citation omitted). The court cannot reach that conclusion here.

Although ALJ Merrill did not specifically state how much weight he assigned to Dr. Benjamin's Medical Source Statement, he noted that Dr. Benjamin "indicated [J.S.] would need to use one or two canes to ambulate" and concluded that "his opinion is not supported by his own notes that the claimant was ambulating without a cane[.]" (AR 29.) The ALJ stated that he assigned "great weight" to Dr. Benjamin's letter to J.S.'s school because "[i]t shows that [J.S.] is able to ambulate effectively, with a cane." (AR 30.) With regard to Dr. Kennedy's opinion that J.S. met the requirements for Listing 101.02, the ALJ stated "[t]his opinion is accorded some weight; however, the internal inconsistency cannot be resolved, as the claimant's record shows that she was even able to ambulate without a cane for short distances." (AR 29.)

In evaluating both of these opinions, it appears that the ALJ only considered one of the *Burgess* factors—the consistency of the opinion with the remaining medical evidence. However, the fact that J.S. was at times able to ambulate without a cane for short distances does not alone provide a "good reason" for assigning less than controlling weight to the opinions of two of J.S.'s treating physicians. Correspondingly, the fact that J.S. at times walked short distances without her cane "does not, in and of itself, constitute effective ambulation." 20 C.F.R. pt. 404, subpt. P, App. 1 § 101.00(B)(2)(b); *see also Sessoms v. Colvin*, 2013 WL 6190967, at *7 (E.D.N.C. Nov. 26, 2013) (internal alteration omitted) (remanding because ALJ failed to properly analyze evidence where consulting physician observed plaintiff moving around examination room, "a limited space . . . akin

19

to 'walking independently about one's home'" without a cane, which did not equate to effective ambulation).

Dr. Kennedy opined that it is best for J.S. to walk "very short distances" and noted that she had a "slow ambulation capacity." (AR 829.) She further found that J.S. had a "significant leg length discrepancy resulting in frequent fatigue [and] some pain after exertion." (AR 897.) Dr. Benjamin opined that J.S. could not "walk throughout the day without some pain" and that her walking limitations would "gradually worsen as she ages." (AR 905.) He found that J.S.'s gait "requires use of at least one cane and ultimately two canes to minimize forces across her hips, reduce trunk lean and protect her back" and noted that "[w]hile it is not always possible for her to use canes in the practical context of her life, it would be better if she did." (AR 906.)

It was procedural error for the ALJ to fail to fully consider the *Burgess* factors and to fail to provide "good reasons" for assigning less than controlling weight to the opinions of Dr. Kennedy and Dr. Benjamin, both of whom opined that J.S.'s condition met the requirements of two Listings: §§ 101.02 and 101.03. (AR 898-99, 905-06.) That error was not harmless because if fully credited, the opinions of J.S.'s treating physicians would establish J.S.'s disability. *Estrella*, 925 F.3d at 98.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion to reverse the decision of the Commissioner (Doc. 11), DENIES the Commissioner's motion to affirm (Doc. 12), and REMANDS for proceedings consistent with this Opinion.
SO ORDERED.

Dated at Burlington, in the District of Vermont, this 18th day of October, 2019.

Christina Reiss, District Judge
United States District Court